CARTER SCHOLER, PLLC
J. ROBERT ARNETT II *Pro Hac Vice*
    Email: barnett@carterscholer.com
8150 N. Central Expressway, Suite 500
Dallas, Texas 75206
Telephone: 214.550.8188
Facsimile: 214-550-8185

Withdrawing Attorneys for Plaintiffs EVOLV HEALTH, LLC and EVOLVHEALTH MEXICO SERVICIOS, S. de R.L. de C.V.

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA, WESTERN DIVISION

| | |
|---|---|
| EVOLV HEALTH, LLC and EVOLVHEALTH MEXICO SERVICIOS, S. de R.L. de C.V., <br><br> Plaintiffs, <br><br> vs. <br><br> COSWAY USA, INC., d/b/a ECOSWAY USA, INC., GLEN JENSEN, JEFFREY N. ALDOUS and VINCENT TAN, <br><br> Defendants and Does 1-10. | CASE NO. 2:16-cv-01602-ODW (ASx) <br><br> **REPLY IN SUPPORT OF MOTION TO WITHDRAW AS COUNSEL FOR PLAINTIFFS** <br><br> Pretrial Conference: August 7, 2017 <br> Trial Date: August 29, 2017 <br><br> Date:   May 1, 2017 <br> Time:   1:30 p.m. <br> Place:  Courtroom 11 <br>         312 N. Spring Street <br>         Los Angeles, CA 90012 <br> Judge:  Hon. Otis D. Wright II |

## REPLY IN SUPPORT OF MOTION TO WITHDRAW
## AS COUNSEL FOR PLAINTIFFS

J. Robert Arnett II and Carter Scholer, PLLC (formerly known as Carter Scholer Arnett Hamada & Mockler, PLLC) file their reply in support of their motion for leave to withdraw as counsel for Plaintiffs Evolv Health, LLC, and EvolvHealth Mexico Servicios, S. de R.L. de C.V. (collectively, "Plaintiffs"), as follows:

### INTRODUCTION

Despite Plaintiffs' attempts to minimize the gravity of their contractual breaches and the seriousness of the breakdown of the attorney-client relationship, Carter Scholer is entitled to withdraw as counsel under the facts presented here. Plaintiffs repeatedly and persistently breached their obligations to pay expenses under an engagement agreement that specifically provided that such breaches were grounds for withdrawal. Plaintiffs made false promise after false promise of payment, and then intentionally engineered delays in counsel filing the motion for withdrawal. Plaintiffs failed to cooperate with counsel in responding to requests for input and information and have no valid excuse for such conduct. Plaintiffs are engaged in a further breach of the engagement agreement by attempting to force Carter Scholer to perform 100 percent of the legal services, contrary to the engagement letter's provision that Carter Scholer perform 25 percent of the legal services. Further, the relationship between Carter Scholer on the one hand and Plaintiffs and their other counsel on the other has become bitter and acrimonious, and the trust necessary for a viable attorney-client relationship is absent.

### ARGUMENTS

**A.   Plaintiffs repeatedly breached the engagement letter agreement.**

Plaintiffs expressly concede that this action is "part and parcel of the Texas Action." Opposition (Doc. 51) at 4.

Therefore, Plaintiffs necessarily concede that this action, as well as the Texas

Action, is governed by the October 24, 2013 engagement letter (Doc. 43-1) among Plaintiffs, Carter Scholer, and Friedman & Feiger.  Under that contract, Plaintiffs are obligated to pay all expenses incurred in the pursuit of the matter and to reimburse Carter Scholer for any expenses advanced "at the end of each month."  *Id.*

Plaintiffs do not contest that they breached the contract by failing for many months to timely pay Carter Scholer's invoices.  Nor do Plaintiffs contest that they agreed in the engagement letter that their failure to pay constituted grounds for withdrawal of counsel, and that Carter Scholer could withdraw by communicating its intent to do so in writing. *Id.*

Further, by conceding that this action is part and parcel of the Texas Action, Plaintiffs concede that Carter Scholer is responsible for only 25 percent of the professional services to be performed and that Mr. Gaubert and Friedman & Feiger are responsible for performing 75 percent of professional services.  *Id.*

While Plaintiffs attempt to minimize the gravity of their contractual breaches, the facts show that:

- By October 2016 Plaintiffs had failed to pay invoices extending back six or seven months;
- Plaintiffs promised twice in October 2016 to "take care of" the invoices and broke both promises;
- Plaintiffs then promised to pay the invoices by the end of November 2016 and broke that promise;
- Plaintiffs then repeatedly promised to pay the invoices in December 2016 and broke all of those promises.

Declaration of J. Robert Arnett II in Support of Reply to Response to Motion to Withdraw as Counsel for Plaintiffs ("Arnett Reply Decl.") ¶¶ 15-19; Exs. 3, 4, 5, and 6.  Plaintiffs' revisionist claim that there was a single promise broken by only a few days is not true. *Id.*, ¶¶ 16, 20; Ex. 7.  This repeated failure to fulfill contractual

obligations and promises to pay is inexplicable, particularly given Mr. White's representation that Evolv had a credit line that could be drawn on to pay Carter Scholer. *Id.*, ¶ 18.

Failure of a client to pay in accordance with an engagement agreement excuses an attorney from continuing to represent the client and provides grounds for withdrawal. *See UMG Recordings, Inc. v. Music Group, Inc.*, No. CV 07-05808 SJO (FFMx), 2008 WL 11287018 *1 (C.D. Cal. Oct. 23, 2008); *Duchrow v. Forrest*, 215 Cal. App. 4th 1359, 1376, 156 Cal. Rptr. 3d 194, 208 (2013); *People v. Prince*, 268 Cal. App. 2d 398, 406, 74 Cal. Rptr. 197, 203 (1968); CAL. R. OF PROF. CONDUCT 3-700(C)(1)(f); TEX. DISCIPLINARY R. OF PROF. CONDUCT 1.15(b)(5); ABA MODEL R. OF PROF. CONDUCT 1.16(b)(5). Plaintiffs do not challenge this principle of law, although they erroneously claim the *Duchrow* case does not support Carter Scholer's position. The court there, however, affirmed a judgment for an attorney against a former client and stated,

> "Forrest's assertion that the judgment was not supported by substantial evidence is based primarily on Duchrow's failure to represent her in the prior suit 'through trial.' But Duchrow testified that he was excused from continuing to represent Forrest because, as alleged in the complaint, she had breached both retainer agreements by, among other things, refusing to pay for services rendered."

*Duchrow*, 215 Cal. App. 4th at 1376, 156 Cal. Rptr. 3d at 208. Thus, the court recognized that a client's failure to pay excuses an attorney from continuing to represent that client. Here, the persistent failure to pay and string of broken promises justify Carter Scholer's withdrawal.

**B.  The timing of Carter Scholer's withdrawal is Plaintiffs' responsibility.**

Plaintiffs' complaints about the timing of Carter Scholer's motion to withdraw are ill-founded because Plaintiffs are the architects of their own

predicament. Plaintiffs committed material breaches of the contract, which entitled Carter Scholer to elect to withdraw. It is a fundamental provision of contract law that once a party materially breaches a contract, the non-breaching party has the choice of treating the contract as terminated. *See, e.g., TGI Friday's Inc. v. Great Northwest Restaurants, Inc.*, 652 F. Supp. 2d 763, 769 (N.D. Tex. 2009); *Hazelwood v. Lafavers*, 394 S.W.3d 620, 628 n. 9 (Tex. App. 2012); *see also Brown v. Grimes*, 192 Cal. App. 4th 265, 277, 120 Cal. Rptr. 3d 893, 902-03 (2011). Carter Scholer elected to withdraw, and Plaintiffs have been on notice since January 2, 2017, that Carter Scholer is withdrawing. Plaintiffs cannot rescind Carter Scholer's election to withdraw by belatedly making payments.

On January 2, 2017, trial was nearly eight months away, the discovery deadline was nearly five months away, and the deadline for naming experts was three months away. Had Plaintiffs acted responsibly and promptly secured counsel, whether by having their existing counsel (Mr. Gaubert and Friedman & Feiger) enter appearances or by hiring new counsel, there would have been plenty of time to prepare this case for trial on the current schedule.

Additionally, Carter Scholer's decision to withdraw was reiterated multiple times to Plaintiffs both before and after Plaintiffs made their untimely payments. Arnett Reply Decl., ¶¶ 20, 23, 24, 26; Exs. 7, 9, 10, 12. Moreover, Plaintiffs caused the delay because they asked Carter Scholer to delay filing the motion to withdraw to avoid prejudicing the Texas Action and settlement opportunities. *Id.*, ¶¶ 21, 23; Ex. 9. Plaintiffs engineered further delay by purportedly not making a decision on substitute counsel. *Id.*, ¶¶ 24, 26, 27, 28; Exs. 10, 12. It was not until March 10, 2017, that Plaintiffs informed Carter Scholer that they would not consent to the withdrawal, necessitating a contested motion to withdraw. Declaration of J. Robert Arnett II in Support of Motion to Withdraw as Counsel for Plaintiffs ("Arnett Decl.") (Doc. 43), ¶ 27. Plaintiffs have no one to blame for the timing of the

withdrawal of counsel and the present time remaining before certain pretrial deadlines but themselves.

**C.   Plaintiffs' failure to cooperate with Carter Scholer after Carter Scholer gave notice of withdrawal, Plaintiffs' additional breaches of the engagement agreement, and the deteriorating relationship between attorney and client further justify the withdrawal of counsel.**

Where the client is not cooperating with the lawyer, withdrawal of counsel, even without substitute counsel, is permitted. *See Arco Environmental Remediation, L.L.C. v. RDM Multi-Enterprises, Inc.*, 166 Fed. Appx. 929 (9th Cir. 2006). Plaintiffs do not deny that they failed to respond to multiple requests for information and input, and their attempt to excuse those failures to cooperate is baseless. Between February 24, 2017 and March 10, 2017, the following requests for information and input were ignored:

- draft discovery responses sent to Mr. Gaubert and Mr. White with requests for input and information;
- draft stipulated protective order (prepared by Defendants' counsel) sent to Mr. Gaubert and Mr. White asking for comments or concerns;
- repeated request for input on draft discovery responses sent to Mr. Gaubert and Mr. White;
- draft stipulated protective order sent to Mr. Gaubert and Mr. Boisvert (of Friedman & Feiger) with Mr. Arnett's comments;
- email to Mr. Gaubert, Mr. White, and Mr. Boisvert that since no input or comments on the draft discovery responses had been received, Mr. Arnett would finalize and serve them;
- an email from Mr. Willes setting forth his issues with the discovery responses forwarded to Mr. Gaubert and Mr. Boisvert;
- red-lined version of stipulated protective order reflecting Mr. Arnett's

    proposed revisions sent to Mr. Gaubert and Mr. Boisvert with a request for their input;

- lengthy email sent to Mr. Gaubert, Mr. White, and Mr. Boisvert itemizing Defendants' issues with Plaintiffs' discovery responses as discussed with Mr. Willes and seeking input and information; and
- a follow-up email sent to Mr. Gaubert, Mr. White, and Mr. Boisvert regarding the issues raised by Mr. Willes.

Arnett Reply Decl., ¶ 29. Plaintiffs claim that the death of Mr. Gaubert's uncle on March 15, 2017 prevented them from responding to Carter Scholer's many requests for information and input. It is not credible, however, that for a three-week period *before* his uncle died, Mr. Gaubert was totally incapacitated from responding to emails. And there is no explanation why the situation with Mr. Gaubert's uncle would somehow prevent Mr. White or Mr. Boisvert from responding to requests for information and input. Moreover, this excuse runs counter to Plaintiffs' narrative that Mr. Gaubert is a virtual stranger to this action with no responsibility for it.

    Indeed, Plaintiffs' position that Carter Scholer is solely responsible for this action and obligated to perform 100 percent of the legal services is false and an additional, ongoing breach of the engagement agreement. The engagement agreement provides that Friedman & Feiger (now Mr. Gaubert and Friedman & Feiger) is responsible for performing 75 percent of the legal services. For Plaintiffs to insist that Carter Scholer perform 100 percent of the legal services while Mr. Gaubert/Friedman & Feiger perform none is a violation of the parties' agreement.

    Plaintiffs' attempt to portray Mr. Arnett and Carter Scholer as solely responsible for this action is contrary to the facts. As noted above, by conceding that this action is part and parcel of the Texas Action, Plaintiffs necessarily concede that Carter Scholer is responsible for only 25 percent of the professional services to be performed and that Mr. Gaubert/Friedman & Feiger are responsible for

performing 75 percent of professional services.  Plaintiffs' repeated reference to Mr. Arnett as "lead counsel" does not change that fact, and Plaintiffs' implications to the contrary are groundless.  "Lead counsel" does not mean the lawyer is solely responsible for a matter or that the lawyer will perform all of the legal services himself.  Arnett Reply Decl., ¶ 11.  Instead, it means the lawyer will handle certain important aspects of the trial.  *Id.*

This action was filed because the Texas court had dismissed claims against the defendants on the ground that the claims should be brought in California, and the decision was made after consultation among Mr. White, Mr. Gaubert, and Mr. Arnett.  *Id.*, ¶ 8.  The decision to hire the Lewis Bribois firm's Los Angeles office as local counsel for this action was made by Mr. Gaubert and approved by Mr. White.  *Id.*, ¶ 9.  Mr. Gaubert individually remained as counsel on the matter with 37.5 percent of the contingent fee.  *Id.*  At the time, the trial of the Texas Action was set to commence in three months and counsel's efforts were going to be focused on that trial in the short term.  *Id.*, ¶ 10.  Accordingly, Mr. Gaubert suggested that only Mr. Arnett needed to be admitted *pro hac vice* in this action for the time being.  *Id.*  Counsel anticipated that the overall matter would settle shortly before or shortly after the trial of the Texas Action.  *Id.*

After Mr. Gaubert withdrew from the Lewis Brisbois firm, he continued to be copied on emails among counsel and had input into the decisions being made in this action.  *Id.*, ¶ 14.  Mr. Gaubert took on the role of settlement counsel and made repeated attempts to settle the overall matter.  *Id.*, ¶ 12.  After judgment was entered in the Texas Action, Mr. Gaubert attempted to procure a settlement of the overall matter, specifically including this action.  *Id.*, ¶ 12; Ex. 2.  After Carter Scholer gave notice of its withdrawal, Mr. Gaubert has made repeated statements that he would jump in and work on the case and that he thought Mr. Boisvert would "jump in" or be "subbing in" to help him.  *Id.*, ¶¶ 21, 26, 27; Ex. 12.  In late February 2017, Mr.

Gaubert asked that Mr. Boisvert be copied on emails relating to the action. *Id.*, ¶ 28. Mr. Gaubert has requested extensions of time from opposing counsel, and represented to Mr. Arnett that, if Mr. Arnett got the joint stipulation on Defendants' motion to compel filed, Mr. Arnett could withdraw and Mr. Gaubert would "take it from there." *Id.*, ¶¶ 31, 34; Ex. 13. Now, however, Mr. Gaubert is singing a different tune, but these are "alternative facts" that do not reflect reality. *See id.*, ¶¶ 35, 36; Ex. 14.

Further, communications between Mr. Arnett and Mr. Gaubert and Mr. White have become increasingly bitter and acrimonious since the filing of the motion to withdraw, and it is likely there will be litigation between them. Therefore, the attorney-client relationship between Plaintiffs and Carter Scholer and Mr. Arnett has broken down to the point that continued representation has been rendered unreasonably difficult by the client and the mutual trust necessary to sustain an appropriate attorney-client relationship no longer exists. Counsel no longer has confidence in Plaintiffs' willingness to meet either their contractual obligations or their obligations to fully cooperate in the representation and counsel have lost all trust and confidence in Plaintiffs and Mr. Gaubert. This absence of mutual trust justifies withdrawal of counsel. *See Emerson v. Mass. Port Auth.*, 138 F. Supp. 3d 73, 76 (D. Mass. 2015); *Lindsay v. Admiral Ins. Co.*, 804 F. Supp. 47, 52 (N.D. Cal. 1992); CAL. R. OF PROF. CONDUCT 3-700(C)(1)(d); TEX. DISCIPLINARY R. OF PROF. CONDUCT 1.15(b)(6); ABA MODEL R. OF PROF. CONDUCT 1.16(b)(6). Finally, because mutual trust is a vital component of a healthy and effective attorney-client relationship and such does not exist here, Plaintiffs will be better served by being represented by new counsel where that mutual trust is present.

Plaintiffs' cited cases do not support a different result. This Court in *Austin Investment Fund, LLC v. United States*, No. SACV 11-750 DOC (ANx), 2011 WL 4947550 *1 (C.D. Cal. Oct. 17, 2011), **granted** a motion to withdraw and stated,

"the risk that substitute counsel will be difficult to obtain or that the client will be subject to a default judgment, does not justify denying a motion for withdrawal." Similarly, the Second Circuit in *Whiting v. Lacara*, 187 F.3d 317, 322-23 (2nd Cir. 1999), reversed the trial court's denial of a motion for withdrawal where the client insisted on dictating legal strategies and intended to sue his counsel if those strategies were not followed. Carter Scholer and Arnett agree that the same results as those in *Austin Financial* and *Whiting* should follow here—the motion for withdrawal should be granted.

WHEREFORE, Carter Scholer and Arnett respectfully request that this Court grant their motion and order that they be withdrawn as counsel for Plaintiffs and discharged from all further responsibility to Plaintiffs in this matter.

DATED: April 3, 2017.

J. ROBERT ARNETT II, *Pro Hac Vice*
CARTER SCHOLER, PLLC

By: /s/ J. Robert Arnett II
J. Robert Arnett II, *Pro Hac Vice*
Withdrawing Attorneys for Plaintiffs EVOLV HEALTH, LLC and EVOLVHEALTH MEXICO SERVICIOS, S. de R.L. de C.V.